**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**ERIC WENNINGER**

Plaintiff,

v.

Hon.
Mag Judge:
Case No.: 26-

**THE LINCOLN NATIONAL LIFE INSURANCE COMPANY**,
an Indiana corporation,

Defendant.
________________________________________________________________/

**COMPLAINT**

Plaintiff, ERIC WENNINGER, through his attorneys, ILANA S. WILENKIN and FELDHEIM & WILENKIN, P.C., complains against the above-named Defendant as follows:

## I. Jurisdiction and Venue

1) This Court's jurisdiction exists under the Employee Retirement Income Security Act of 1974 ("ERISA"), specifically, 29 U.S.C. §§ 1132(e)(1) and 1132(f), which provisions grant this Court the jurisdiction to hear civil actions to recover benefits due under the terms of an employee welfare benefit plan.

2) Plaintiff, Eric Wenninger ("Mr. Wenninger"), worked for Fisher & Company, which sponsors and administers the Fisher & Company Health and Welfare Benefit Plan (the "Plan/Policy") for the benefit of its employees/former employees, including Mr. Wenninger.

3) Defendant, The Lincoln National Life Insurance Company ("LF") administers long-term disability ("LTD") and, upon information and belief, total disability life premium waiver claims for the Plan. It also underwrites said coverages.

4) 29 U.S.C. § 1133 provides a mechanism for the administrative or internal appeal of benefit denials. Mr. Wenninger has either exhausted all his appeals or has been denied access to a meaningful and/or full and fair pre-suit appellate review. This matter is ripe for juridical review.

5) Pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, venue is proper in the Eastern District of Michigan.

## II. <u>Nature of Action</u>

6) This is a claim seeking disability income benefits, a total disability waiver of life insurance premium, and other damages described below. The claims are being brought pursuant to § 502(a)(1)(B) of ERISA - 29 U.S.C. § 1132(a)(1)(B).

## III. The Parties

7) Mr. Wenninger is 60 years old. He was, and continues to remain, a resident of Washington Township, Michigan.

8) LF is an Indiana corporation conducting insurance-related business in Michigan, including the Eastern District. Its Resident Agent for service-of-process is CSC-Lawyers Incorporating Service (Company) 3410 Belle Chase Way, Suite 600, Lansing, MI 48911.

9) During all relevant times, the Plan constituted an "employee welfare benefit plan," as defined by 29 U.S.C. § 1002(1), and, incidental to his employment with Fisher & Company, Mr. Wenninger received coverage under the Plan as a "participant," as defined by 29 U.S.C. § 1002(7). This claim relates to benefits due under the above-described Plan.

## IV. Factual Statement

### A. Medical Evidence, Claim History-Review & Appeal Review

10) Mr. Wenninger began working for Fisher & Company during July 2018 as a Senior Supplier Quality Engineer.

11) Fisher & Company provided its employees, including Mr. Wenninger, with various employment benefits, including LTD insurance and life insurance that allowed for a total disability premium waiver.

12) Since approximately September 2022, Mr. Wenninger had been suffering with increasingly debilitating back pain. He stopped working in any capacity on 1/19/23 and has not engaged in any substantial, gainful activity since that date.

13) Shortly after his last day of work, Mr. Wenninger applied to LF to begin receiving LTD benefits and a total disability life insurance premium waiver.

14) LF approved Mr. Wenninger's claim for own-occupation LTD benefits, effective 7/19/23[1]. Presumably around the same time, LF also approved Mr. Wenninger's life premium waiver claim.

15) The Social Security Administration advised Mr. Wenninger via a 9/8/24 Award Letter that he became disabled under its rules on 1/20/23, with a $2,951.00 monthly benefit payable as of 7/1/23.

16) On 10/26/23, LF denied Mr. Wenninger's life waiver claim.

17) Mr. Wenninger was advised by Erin Reyes (LF representative) on or about 10/15/24 that the WOLP appeal could be delayed. Mr. Wenninger appealed that decision on 1/2/26.

18) Throughout Mr. Wenninger's own-occupation LTD claim, LF requested updates from his pain management physician, Michael Bonnette, M.D.

[1] LF incorrectly calculated Mr. Wenninger's monthly LTD benefit at his claim's inception, which led to overpayment and tax issues that are detailed toward the end of his Complaint.

19) On 1/14/24, Dr. Bonnette completed a Restrictions Form for LF in which he indicated:

> **For physical diagnoses, check one that indicates what your patient is capable of performing occupationally on a full-time basis:**
>
> X - Sedentary
>
> No lifting greater than 10lbs
> No excessive bending, twisting, lifting
> No prolonged sitting or standing
>
> Patient has epidural scheduled and plans to continue prescription medications. If sufficient relief, will consider surgical intervention vs [illegible].
>
> [Patient experiences] significant pain w/sitting, bending forward, standing, right lower extremities, weakness and numbness.

(Ex. 4 of 1/2/26 Administrative Appeal).

20) On 6/13/24, Dr. Bonnette completed a Restrictions Form for LF in which he indicated:

> **For physical diagnoses, check one that indicates what your patient is capable of performing occupationally on a full-time basis:**
>
> X - Sedentary
>
> The patient has significant back pain that radiates to the right lower extremity impeding his ability to walk, twist, bend, lift, and sit for prolonged periods of time. Has left rotator cuff

> tear, limits ability to lift objects or use his left arm to any [illegible] degree.
>
> The patient has surgical evaluations set up with Dr. Marshall (ortho) and spine surgeon coming up. *Id.*

21) On 10/16/24, Dr. Bonnette completed a Restrictions Form for LF in which he indicated:

> **For physical diagnoses, check one that indicates what your patient is capable of performing occupationally on a full-time basis:**
>
> X - Sedentary
>
> No lifting greater than 10lbs
> No excessive bending, twisting, lifting
> No prolonged sitting or standing > 30 minutes at a time
>
> Recommended spinal cord stimulator vs surgical intervention. If treatment successful, return to work 3-6 months post-intervention. *Id.*

22) On 2/9/25, Dr. Bonnette completed a Restrictions Form for LF in which he indicated:

> **For physical diagnoses, check one that indicates what your patient is capable of performing occupationally on a full-time basis:**
>
> X - Sedentary
>
> No lifting greater than 10lbs
> No excessive bending, twisting, lifting
> No prolonged sitting or standing > 30 minutes at a time

> Recommended spinal cord stimulator vs surgical intervention if treatment is successful. Patient will be able to return to work 3-6 months post-op.
>
> [Patient experiences] significant pain with sitting, [illegible], forward flexion, L UE weakness. *Id.*

23) As the Policy's 24-month any-occupation was approaching, LF initiated an any-occupation review during approximately early 2025 to determine whether Mr. Wenninger would be unable to perform, with reasonable continuity, the material and substantial duties of any occupation beginning 7/19/25.

24) As part of LF's any-occupation review, it enlisted Kevin Kohan, D.O. (PM&R) to perform a peer/records review and had its employee Alicia P., MA, CRC perform a Transferrable Skills Analysis.

25) On 3/3/25, Kevin Kohan, D.O. (PM&R) authored a peer review report for LF in which he opined as follows:

> Taking into consideration the entire clinical picture, including evidence-based medicine and any medication or other truth side effects, the claimant has had functional impairments from 02/24/2025 and ongoing through 07/18/2025 and beyond. The claimant is a 59-year-old individual with a date of birth of 02/11/1966 who is diagnosed with lumbar radiculopathy, intervertebral disc displacement, left shoulder pain, left supraspinatus full-thickness tear, postlaminectomy syndrome, low back pain, and chronic pain syndrome.

The claimant is treated by Dr. Michael Bonnette from 10/02/2024 through 02/05/2025 with physical examinations revealing 5/5 strength of the upper extremities except left shoulder abduction at 4/5 strength, 5/5 strength of the lower extremities, sensation intact to light touch, negative Hoffman's test, normal gait, positive Hawkins test on the left, positive empty can test on the left, mildly positive lumbar facet loading test, positive straight leg raise test on the right, limited range of motion of the lumbar spine, and pain.

The treating provider had placed the claimant on restrictions of lifting no greater than 10 pounds, no bending, no twisting, no lifting, and no prolonged sitting or standing for longer than 30 minutes at a time from 08/01/2024 through 08/01/2025. The treating provider's plan for the return to work was to continue medications, continue the home exercise program, and potentially undergo a spinal cord stimulator trial.

**[Q4]. Do medical records support any R&Ls that were recommended by treating providers for the timeframes in question?**

[A]. The treating provider had placed the claimant on restrictions consistent with lifting no more than 10 pounds, no bending, twisting, lifting, or prolonged sitting or standing for longer than 30 minutes at a time from 08/01/2024 through 08/01/2025. The medical records would support these restrictions and limitations recommended by the treating provider for the timeframe in question with the exception of the timeframe as it would be appropriate for the claimant to be reassessed 12 weeks from the date of this review.

[Q7]. Please initiate AP contact when it may clarify any significant areas such as diagnosis, R&Ls, treatment opportunities, prognosis, or reason for work absence.

> [A]. There are no calls established at the time of this review. I would have asked: Would the claimant have been able to work with restrictions and limitations during the time frame under question?
>
> What restrictions do you feel are medically supported? How long?
>
> What clinical abnormalities are causing restrictions and limitations?
>
> Are the imposed restrictions and limitations due to self-reported complaints?

(Ex. 5 of 1/2/26 Administrative Appeal).

26) In response to Dr. Kohan's report, Dr. Bonnette prepared a narrative report dated 3/6/25:

> Eric was first seen in our clinic on 11/3/2023 for evaluation and management of his low back pain. The patient's low back and right leg symptoms began in late 2022. He was previously seen by Dr. Polina who recommended therapy and performed multiple injections with minimal relief in symptoms. He then underwent a discectomy/hemilaminectomy with Dr. D'Andrea on June 26, 2023. Unfortunately he did not receive significant benefit with this surgery. In November of 2023, he underwent transforaminal epidural injections at the L3-4 and L4-5 levels on the right with only mild benefit in symptoms. In January of 2024, he underwent an interlaminar epidural injection with less improvement than the transforaminal injections. The patient attempted working with PT in early 2024 with no significant improvement. His low back and radicular symptoms slowly worsened throughout 2024 and required treatment of his symptoms with hydrocodone-acetaminophen, pregabalin, and tizanidine. We recommended a spinal cord stimulator trial

> and implant but decided against this treatment. He consulted with Dr. Fiani (Neurosurgery) who recommended surgical intervention, but he decided not to move forward with this. He consulted with Dr. Moosavi regarding regenerative treatments but has not made a decision on moving forward with these treatments. The patient's symptoms have resulted in him not being able to work. He cannot stand or walk for more than 30 minutes at a time without the pain becoming unbearable.
>
> Additionally, Eric sustained a fall on Easter 2024 which resulted in left shoulder pain and a rotator cuff tear. We then referred the patient to Dr. Nate Marshall for further evaluation and management of his shoulder pain.

(Ex. 4 of 1/2/26 Administrative Appeal).

27) On 3/10/25, LF's employee, Alicia P., prepared a Transferrable Skills Analysis based solely on Dr. Kohan's opinions in which she concluded that Mr. Wenninger could work as a Test Engineer, Mechanical Equipment and a Product Safety Engineer.

28) LF provided Dr. Bonnette's 3/6/25 report to Dr. Kohan, who authored a 3/17/25 addendum:

> Additional documentation reveals on 03/06/25, Dr. Michael Bonnette had stated that the claimant has continued undergone multiple injections with minimal relief, underwent discectomy and hemilaminectomy on 06/26/23 with minimal relief. The treating provider had recommended spinal cord stimulator trial but the claimant decided against this treatment as well as neurosurgery recommended surgical intervention and had decided not to move forward

> with this procedure. It is noted that the claimant is unable to work, stand, or walk for more than 30 minutes at a time without pain becoming unbearable. Considering the claimant has a history of microdiscectomy June 2023, positive impingement testing on the left shoulder, positive empty can test on the left, positive lumbar facet loading test, history of MRI showing foraminal stenosis, positive straight leg raise test on the right, limited range of motion of the lumbar spine, and tenderness of the SI joint, it would be appropriate that the claimant be restricted from 02/24/25 and ongoing through 07/18/25 and beyond.
>
> The claimant should be reassessed 12 weeks the date of this review with updated progress notes and imaging documentation as the claimant continues to have minimal relief . . .
>
> Sitting -- up to one hour at a time for a total of eight hours per day with the ability to alter position as needed.

(Ex. 5 of 1/2/26 Administrative Appeal).

29) On 3/19/25, LF denied Mr. Wenninger's claim effective 7/19/25 based on Dr. Kohan and Alicia P.'s opinions.

30) On 1/2/26, Mr. Wenninger appealed LF's and life premium waiver denials, which included then updated and historical medical evidence.

31) A 12/1/22 lumbar MRI demonstrated:

> L2-L3: Disc space narrowing and desiccation with anterior osteophytes. Bulging annulus and bilateral facet hypertrophy and facet joint effusions with mild central canal and mild left foraminal stenosis.

L3-L4: Disc space narrowing and desiccation. Bulging annulus and bilateral facet hypertrophy and facet joint effusions with mild central canal and mild left foraminal stenosis. Focal right foraminal protrusion type herniation with severe right foraminal stenosis and mass effect on the exiting right L3 nerve root, best seen on image 12 of series 6.

L4-L5: Disc space narrowing and desiccation. Bulging annulus and bilateral facet hypertrophy and small right facet joint effusion with mild central canal and moderate right and mild left foraminal stenosis.

L5-S1: No evidence of significant disc disease. No evidence of significant foraminal or central canal stenosis. Bilateral facet hypertrophy.

(Ex. 1 of 1/2/26 Administrative Appeal).

32) Mr. Wenninger's primary care physician (Dr. Craig) referred Mr. Wenninger to Ryan Pollina, M.D. (pain management) for evaluation and possible treatment.

33) On 1/19/23, Dr. Pollina noted the following:

STRAIGHT LEG RAISING TEST: positive straight leg raise on the right.

Lumbar radiculopathy:

Notes: Is a pleasant 56-year-old male history of lower back pain radiation to his right lower extremity. This started in September

> 2022. Somewhat insidious onset of severe pain in his lower back started radiating to his right lower extremity. He has had physical therapy for over 8 weeks and seen moderate improvement but has continued severe pain. He is [sic] been managed medically and with therapies had continued severe pain ended up having an MRI of his lumbar spine most notable for right L3-4 disc herniation causing neural foraminal impingement symptoms consistent with a right lumbar radiculopathy is [sic, has] failed conservative management has significant pain will schedule for right-sided transforaminal epidural steroid injection in the near future if he is failing to get any meaningful benefit from this consideration was made for a surgical referral I do believe he would be a good candidate for a microdiscectomy. Reviewed his MRI personally reviewed primary care physician's notes.
>
> Epidural steroid injection:
> This epidural steroid injection will be performed under fluoroscopic guidance.

(Ex. 2 of 1/2/26 Administrative Appeal).

34) On 1/30/23 and 2/13/23, Dr. Pollina administered right L3-4 transforaminal epidural steroid injections. On 3/6/23, he administered an L3-4 interlaminar lumbar epidural steroid injection. *Id.*

35) On 3/23/23, Mr. Wenninger followed up with Dr. Pollina as follows:

> STRAIGHT LEG RAISING TEST: positive straight leg raise on the right.
>
> 1. Lumbar radiculopathy
> 2. Lumbar spondylosis

> Notes: Is a 57-year-old male severe right-sided leg pain 3 epidural steroid injections with partial improvement full course of physical therapy without improvement. I sent him to Dr. Sidhu who recommended a lumbar fusion he was uncertain about this ended up seeing Dr. LaMacchia who offered out [sic] discectomy and laminectomy. He has had continued pain I think that it he has to have surgery I have explained to him the risks of not having surgery and the fat [sic] in the form of advancing weakness in his right lower extremity he seems hesitant he is going to see a third surgeon for another opinion. I have told him that I would support any surgical correction and that this is not my area of expertise and appreciate his surgeon's input. The [sic] I believe he will need to be decompressed. He is [sic] been taking hydrocodone with some improvement 1 pill daily I will take over this we talked about the risks of opiate medications detail. Also been given Celebrex to see if this helps long-term opiate therapy is not an option. I have explained this to him. That being said he will need to come up with a game plan in terms of what he is going to do from a surgical perspective. We will keep him off work until April 15 until we have a pending plan on what specifically will be done to correct his underlying structural abnormality. *Id.*

36) On 3/21/23, Dr. Pollina referred Mr. Wenninger to Michigan in Motion Physical Therapy. *Id.*

37) Due to insurance issues, Mr. Wenninger ultimately participated in physical therapy on various occasions at Athletico and Team Rehab beginning 2022 through 2025. (Ex. 3 of 1/2/26 Administrative Appeal).

38) Mr. Wenninger returned to Dr. Pollina on 4/13/23 for a follow-up appointment:

> Continued weakness in the right side he has not gotten any better with physical therapy medications and epidural steroid injections. Cannot seem to make up his mind about surgery I can certainly understand his hesitancy but expressed that the urgency of this is of importance as he is having weakness in his right leg and I do not see him getting better without decompression. He has asked for another surgical referral which I am more than happy to provide him however ultimately he will not [sic] need to make the decision on surgical correction. Nothing further to offer him outside of short-term use of pain medications until he is 5 [sic] found a more definitive answer I will take care of his paperwork we will keep him off work as I do not see him getting better in the next 2 months particular given his hesitation to pursue surgery he can follow-up with the surgeon in the future.
>
> Referral To: Kenneth D'Andrea
> Reason: Right L3 Radiculopathy, failed PT, Failed ESI

(Ex. 2 of 1/2/26 Administrative Appeal).

39) On 6/26/23, Dr. D'Andrea performed a L3-4 right-sided far lateral microdiscectomy. (Claim File).

40) An 8/30/23 lumbar MRI demonstrated:

> L1-L2: No evidence of significant disc disease. No evidence of significant foraminal or central canal stenosis. Bilateral facet hypertrophy.
>
> L2-L3: Bulging annulus and bilateral facet hypertrophy and small facet joint effusions with moderate left and mild right foraminal stenosis.
>
> L3-L4: Bulging annulus, broad right foraminal protrusion type herniation and bilateral facet hypertrophy

and small facet joint effusions with mild right lateral recess stenosis, and moderate right and mild left foraminal stenosis.

L4-L5: Bulging annulus and left greater than right facet hypertrophy with moderate right and mild left foraminal stenosis.

L5-S1: No evidence of significant disc disease. No evidence of significant foraminal or central canal stenosis. Bilateral facet hypertrophy.

The following compressive sequelae are noted:

2. Moderate foraminal stenosis on the left at L2-3, on the right at L3-4, and on the right at L4-5.

3. Mild right lateral recess stenosis at L3-4. Mild foraminal stenosis on the right at L2-3 and on the left at L3-4 and L4-5.

4. Normal anterior alignment and no evidence of acute compression fracture.

(Ex. 1 of 1/2/26 Administrative Appeal).

41) A 9/5/23 EMG indicated:

This is an **abnormal EMG/NCS of the bilateral lower extremities**.

There is Electrodiagnostic **evidence suggestive of a chronic right L3 radiculopathy**.

There were **also florid denervation potentials in the right L4-S1 paraspinals**; unclear significance given recent lumbar surgery and no acute findings in the right lower extremity.

> Finally, the right gastroc with small, non-discrete MUAP. The MUAPs, though, did not appear myopathic.

(Ex. 1 of 1/2/26 Administrative Appeal).

42) On 10/5/23, Dr. D'Andrea noted during Mr. Wenninger's 4-month post-operative appointment:

> The patient continues to have pain in the anterior thigh on the right consistent with an L3 radiculopathy . . . This patient is suffering from a right-sided L3 radiculopathy secondary to a re-herniation of the far lateral disc at L3-4 compressing the exiting L3 nerve root . . . I would recommend to have an L3-4 minimally invasive transforaminal lumbar interbody fusion.

(Claim File).

43) A 10/6/23 lumbar MRI demonstrated:

> L2-L3: Mild disc bulge with mild impression upon the ventral thecal sac without significant spinal canal or neuroforaminal stenosis.
>
> L3-L4: Mild disc bulge, superimposed right foraminal disc herniation and bilateral facet arthropathy with impingement of the exiting right L3 nerve root there are apparent partial right facetectomy postoperative changes with postoperative enhancing granulation tissue seen at the facetectomy bed partially extending towards the right foramen. Mild to moderate right neural foraminal stenosis and minimal relative narrowing.

L4-L5: Diffuse disc bulge, superimposed small right foraminal disc herniation/annular fissure and bilateral facet arthropathy and ligamentum flavum thickening with resultant mild to moderate right neural foraminal stenosis and mild left neural foraminal stenosis with mild impingement of the exiting right L4 nerve root. Narrowing of the right lateral recess without significant spinal canal stenosis.

L5-S1: Bilateral facet arthropathy and minimal disc bulge without significant spinal canal or neural foraminal stenosis.

(Ex. 1 of 1/2/26 Administrative Appeal).

44) A 4/27/24 left shoulder MRI indicated:

1. Full-thickness tear of the anterior aspect of the supraspinatus tendon at its critical zone, measuring approximately 1.8 cm in the AP dimension and 2.4 cm in the mediolateral dimension.

2. Mild tendinosis and partial thickness tear of the subscapularis and infraspinatus and remaining supraspinatus tendons. Subtle muscle atrophy of the supraspinatus and subscapularis.

3. High-grade partial-thickness tear of the biceps tendon.

4. Mild to moderate subacromial and subacromial subdeltoid bursitis.

5. Moderate acromioclavicular and mild glenohumeral osteoarthritis, with mild to moderate joint effusions.

(Ex. 1 of 1/2/26 Administrative Appeal).

45) On 7/23/24, Mr. Wenninger presented to Brian Fiani, D.O. for a neurosurgical consult. Dr. Fiani noted the following findings:

> On MRI of the lumbar spine there is **L3-L4 L4-L5 right-sided eccentric far lateral disc herniations with severe nerve compression**.
>
> PLAN:
>
> 1. Patient has tried and exhausted conservative management efforts. We discussed his symptoms his imaging and possible treatment plans at great length for over 1 hour.
>
> 2. Recommend continuing conservative management efforts at this given time with therapy and medications.
>
> 3. I did discuss with him per his request operative options which we discussed L3-L4 and L4-L5 anterior lumbar interbody fusion with posterior instrumentation and fusion. This approach has been shown to have the least amount of blood loss the lowest hospitalization length of stay and best postoperative pain scores. I showed him medical literature from peer-reviewed journals as well as imaging and cartoon pictures of what interbody cages would look like for ALIF surgery. I explained the mechanics of the surgery and the risk benefits alternatives expectations great detail.

(Claim File). (emphasis added).

46) On 8/7/24, Mr. Wenninger treated with Dr. Bonnette:

> ***Treatment Summary:***
> Physical Therapy/Chiropractic:

- Completed PT and is working on home exercise program at this time.

Prior Medications:
- gabapentin, pregabalin

Procedures:
- TFESI L3 and L4 x2: ~10-20% improvement
- ILESI L4-L5 (1/30/24): <10% improvement

***Exam:***
Special Tests:
-Hawkins/Nears: positive on the left
-Empty Can Test: positive on the left
-Lumbar Facet Loading: mildly positive
-Straight Leg Raise: positive on the right
-FADIR: negative
-FABER/Gaenslens/thigh Thrust: negative

***Assessment:***
The patient presents with multiple conditions including:
1. Left shoulder pain
2. Left supraspinatus full thickness tear
3. Intervertebral Disc Displacement with radiculopathy
4. Postlaminectomy syndrome
5. Low Back Pain
6. Chronic Pain Syndrome

***Plan:***
2. Interventions:
   - discussed SGS but patient is not ready to proceed with this procedure at this time.

3. Medications:
   - will refill and continue hydrocodone-APAP 7.5-325mg BID prn, pregabalin 150mg BID, tizanidine 2mg BID prn

4. Referrals:
   - encouraged continued follow up with Dr. Fiani and Marshall at this time.

(Ex. 7 of 1/2/26 Administrative Appeal).

47) On 10/2/24, Mr. Wenninger treated with Dr. Bonnette for well-established spinal pain, left shoulder pain, and right leg pain and numbness. He used a cane for ambulatory assistance:

> ***Exam:***
> MSK:
> Tenderness to Palpation: TTP in the left posterolateral shoulder
>
> ROM:
> -L-Spine: Restricted inflexion and extension
> -Shoulder R: full, L: restricted in abduction, flexion, and internal rotation
>
> Special Tests:
> -Hawkins/Neers: positive on the left
> -Empty Can Test: positive on the left
> -Lumbar Facet Loading: mildly positive
> -Straight Leg Raise: positive on the right
> -FADIR: negative
> -FABER/Gaenslens/Thigh Thrust: negative
>
> ***Assessment:***
> The patient presents with multiple conditions including:
> 1. Left shoulder pain
> 2. Left supraspinatus full thickness tear
> 3. Intervertebral Disc Displacement with radiculopathy
> 4. Postlaminectomy syndrome
> 5. Low Back Pain
> 6. Chronic Pain Syndrome

> ***Plan:***
>
> 2. Interventions:
>    - discussed SCS but patient is not ready to proceed with this procedure at this time, will discuss with patient educator
>
> 3. Medications:
>    - will administer toradol injection today 60mg IM
>
>    - will refill and continue hydrocodone-APAP 7.5-325mg BID prn, pregabalin 150mg BID, tizanidine 2mg BID prn
>
> 4. Referrals:
>    - encouraged continued follow up with Dr. Fiani and Marshall at this time
>
> 5. Education:
>    - Discussed patient's condition and diagnosis at length. Educated patient regarding benefits and risks of available treatment options. Patient acknowledged understanding and was agreeable with stated plan.
>
> 6. DME:
>    - none
>
> 7. Physical Therapy:
>    - Recommend patient to continue with their home exercise program as directed by their physical therapist. Discussed patient understands benefit of home exercise regimen and ability to this and they agree. *Id.*

48) On 12/10/24, Mr. Wenninger treated with Dr. Moosavi, Dr. Bonnette's practice colleague:

> ***Assessment:***

The patient presents with multiple conditions including:
1. Left shoulder pain
2. Left supraspinatus full thickness tear
3. Intervertebral Disc Displacement with radiculopathy
4. Postlaminectomy syndrome
5. Low Back Pain
6. Chronic Pain Syndrome

***Plan:***

1. Diagnostics:
   - none at this time

2. Interventions:
   - discussed SGS but patient is not ready to proceed with this procedure at this time, will discuss with patient educator.

   We discussed SCP VS SD treatment and I have advised 3 level ID treatment using SCP and he will consider

3. Medications:
   -will refill and continue hydrocodone-APAP 7.5-325mg BID prn, pregabalin 150mg BID, tizanidine 2mg BID prn

4. Referrals:
   - encouraged continued follow up with Dr. Fiani and Marshall at this time

6. DME:
   - encouraged continued use of UV belt

7. Physical Therapy:
   - Recommend patient to continue with their home exercise program as directed by their physical therapist. Discussed patient understands benefit of home exercise regimen and ability to this and they agree. *Id.*

49) On 2/26/25, Mr. Wenninger treated with Dr. Bonnette for chronic back, shoulder, and right leg pain:

> The patient presents with multiple conditions including:
> 1. Intervertebral Disc Displacement with radiculopathy
> 2. Postlaminectomy syndrome
> 3. Low Back Pain
> 4. Left shoulder pain
> 5. Left supraspinatus full thickness tear
> 6. Chronic Pain Syndrome
>
> 2. Interventions:
> - continued to recommend a SCS trail [sic] vs regenerative treatments to help treat this post-laminectomy syndrome but he is hesitant to proceed with either of these treatments as he had poor experience with the prior surgical intervention to his spine.
>
> 3. Medications:
> -will refill and continue hydrocodone-APAP 7.5-325mg BID prn, pregabalin 150mg BID, tizanidine 2mg BID prn
>
> 4. Referrals:
> - encouraged continued follow up with Dr. Fiani and Marshall at this time
>
> - will refer to Dr. Moosavi for considerations of regenerative treatments
>
> 5. Education:
> - Discussed patient's condition and diagnosis at length. Educated patient regarding benefits and risks of available treatment options. Patient acknowledged understanding and was agreeable with stated plan.

6. DME:
   - encouraged continued use of UV belt

7. Physical Therapy:
   - Recommend patient to continue with their home exercise program as directed by their physical therapist. Discussed patient understands benefit of home exercise regimen and ability to this and they agree. *Id.*

50) On 3/12/25, Mr. Wenninger treated with Dr. Moosavi as follows:

***Exam:***
MSK:
Tenderness to Palpation: TTP in the bilateral lumbar paraspinals

ROM:
-L-Spine: Restricted inflexion and extension

Special Tests:
-Lumbar Facet Loading: mildly positive
-Straight Leg Raise: positive on the right
-FADIR: negative
-FABER/Gaenslens/Thigh Thrust: negative

***Assessment:***
The patient presents with multiple conditions including:
1. lntervertebral Disc Displacement with radiculopathy
2. Postlaminectomy syndrome
3. Low Back Pain
4. Left shoulder pain
5. Left supraspinatus full thickness tear 6, Chronic Pain Syndrome

***Plan:***
2. Interventions:

- continued to recommend a SCS trail [sic] vs regenerative treatments to help treat this post-laminectomy syndrome but he is hesitant to proceed with either of these treatments as he had poor experience with the prior surgical intervention to his spine.

We again covered the regenerative approach for his lumbar spine pain. You will consider this. It has been good to the patient

3. Medications
- we will refill and continue hydrocodone-APAP 7.5-325mg BID prn, pregabalin 150mg BID, tizanidine 2mg BID prn

4. Referrals:
- encouraged continued follow up with Dr. Fiani and Marshall at this time

- will refer to Dr. Moosavi for considerations of regenerative treatments

6. DME:
- encouraged continued use of UV belt

7. Physical Therapy:
- Recommend patient to continue with their home exercise program as directed by their physical therapist. Discussed patient understands benefit of home exercise regimen and ability to this and they agree. *Id.*

51) On 3/26/25, Dr. Moosavi performed Regenexx, lumbar spine, for which Mr. Wenninger paid $4,780.00 out-of-pocket because insurance would not cover the treatment. (Ex. 9 of 1/2/26 Administrative Appeal).

52) Dr. Moosavi noted the following in connection with the Regenexx procedure:

> 1. Lumbar spine bilateral L4-5 and L3-4, bilateral SI joint Supporting ligaments injections.
>
> 2. Bilateral L4-5 transforaminal epidural with platelet lysate
>
> 3. L4-5 IL
>
> 4. Multifidus injection supraspinous, interspinous, iliolumbar ligaments.
>
> 5. Bilateral L3-5 facet joint.
>
> Chronic lower back pain, bilateral radiculitis and facet arthropathy in SI joint sacroiliitis.

(Ex. 7 of 1/2/26 Administrative Appeal).

53) On 4/9/25, Mr. Wenninger treated with Dr. Mossavi for a video visit as follows:

> Pain Description
> Location of Pain: Low back pain, left shoulder
> Radiation of Pain: Right lower extremity
> Pain Descriptors: Dull/aching, numbness, throbbing, tightness
> Aggravating Factors: Bending forwards, climbing stairs, driving, lifting objects, rising from seated position, sitting, standing, walking
> Alleviating Factors: Sitting
> Temporal Association: Changes in severity but always present
> Current Pain Score: 8/10, Pain Range (over last week): 7-10/10.
>
> ***Assessment:***

The patient presents with multiple conditions including:
1. Intervertebral Disc Displacement with radiculopathy
2. Postlaminectomy syndrome
3. Low Back Pain
4. Left shoulder pain
5. Left supraspinatus full thickness tear
6. Chronic Pain Syndrome

***Plan:***

2. Interventions:
   - continued to recommend a SCS trail [sic] vs regenerative treatments to help treat this post-laminectomy syndrome but he is hesitant to proceed with either of these treatments as he had poor experience with the prior surgical intervention to his spine. We completed SCP lumbar spine and he is recovering from this.

3. Medications:
   -will refill and continue hydrocodone-APAP 7.5-325mg BID pm, pregabalin 150mg BID, tizanidine 2mg BID pm

4. Referrals:
   - encouraged continued follow up with Dr. Fiani and Marshall at this time

   - will refer to Dr. Moosavi for considerations of regenerative treatments

6. DME:
   - encouraged continued use of UV belt

7. Physical Therapy:
   - Recommend patient to continue with their home exercise program as directed by their physical therapist. Discussed patient understands benefit of home exercise regimen and ability to this and they agree. *Id.*

54) On 4/30/25, Mr. Wenninger treated with Dr. Bonnette for established conditions. *Id.*

55) On 5/7/25, Mr. Wenninger treated with Dr. Moosavi who, *inter alia*, opined that Mr. Wenninger remained disabled from returning to work. *Id.*

56) On 6/25/25, Mr. Wenninger treated with Dr. Bonnette for ongoing low back pain, right leg weakness and numbness, and left shoulder pain. Dr. Bonnette noted that Mr. Wenninger uses a cane to help him safely ambulate:

> ***Exam:***
> MSK:
> Tenderness to Palpation: TTP in the bilateral lumbar paraspinals
>
> ROM:
> -L-Spine: Restricted inflexion and extension
>
> Special Tests:
> -Lumbar Facet Loading: mildly positive
> -Straight Leg Raise: positive on the right
> -FADIR: negative
> -FABER/Gaenslens/Thigh Thrust: negative
>
> ***Assessment:***
> The patient presents with multiple conditions including:
> 1. Intervertebral Disc Displacement with radiculopathy
> 2. Postlaminectomy syndrome
> 3. Low Back Pain
> 4. Left shoulder pain
> 5. Left supraspinatus full thickness tear
> 6. Chronic Pain Syndrome
>
> ***Plan:***

2. Interventions:
   - have discussed SCS previously as an alternative to treating his continued back and radicular symptoms, continue to recommend this treatment

3. Medications:
   - will refill and continue hydrocodone-APAP 7,5-325mg BID prn, pregabalin 150mg BID, tizanidine 2mg BID prn

   - We reviewed the goals for continuing opioid therapy and we were in agreement that the benefits outweighed the risks at this time. We reviewed the Start Talking form and opioid contract. MAPS was reviewed and consistent with patient's history with out any concerns. Random urine drug screens have not been concerning. We reviewed that opioids are associated with short-term risks, including nausea, vomiting, constipation, drowsiness, and respiratory depression. Long-term risks include tolerance, addiction, hyperalgesia, hormonal changes including hypogonadism, osteoporosis, depression, and cognitive impairment. All of the patient's questions and concerns were addressed.

6. DME:
   - continue LSO

7. Physical Therapy:
   - Recommend patient to continue with their home exercise program as directed by their physical therapist. Discussed patient understands benefit of home exercise regimen and ability to this and they agree.

8. Disability:
   - Recommend continued off work. *Id.*

57) Mr. Wenninger presented to Michigan in Motion on 7/7/25 for a Functional Capacity Evaluation. In relevant part, PT Goodwine noted:

> **Consistency of Effort**
> During objective functional testing, Mr. Wenninger demonstrated consistent effort throughout 100.0% of this test which would suggest Mr. Wenninger put forth full and consistent biomechanical and evidence based effort during this evaluation.
>
> **Reliability of Pain Ratings**
> Throughout objective functional testing, Mr. Wenninger reported reliable pain ratings 83.3% of the time which would suggest that pain could have been considered a limiting factor during functional testing.
>
> **Summary / Impression**
> Mr. Wenninger is unable to work full time even in a Sedentary capacity. The unskilled sedentary occupational base is significantly eroded because he is unable to walk occasionally, stand for 1 hour and 45 minutes, sit for approximately 6 hours of an 8-hour workday, and sit at least 2 hours at a time.
>
> The functional activities this client should avoid within a competitive work environment include Sitting, Walking, Standing, Pinching, Simple Grasping, Firm Grasping, Fine Coordination, Gross Coordination, Forward Reaching, Above Shoulder Reach, lifting, pushing, pulling, Bending, Squatting, Sustained Kneeling, Repetitive Kneeling, Crawling, Static Balance and Dynamic Balance.
>
> **Limiting Factors Noted During Testing**
> During this evaluation, Mr. Wenninger presented with limiting factor(s) during objective functional testing which included: Increased Pain, Inadequate Strength and Gait Impairment.
>
> **History of Present Condition**

Mr. Wenninger started having pain in his back and R LE in Oct 2022. He tried PT with no significant improvement. He applied for disability on 1/19/23 due to intractable low back pain; lumbar radiculopathy; chronic pain syndrome; and disc displacement for which Mr. Wenninger underwent a lumbar microdiscectomy on 6/26/23 that provided minimal relief, especially with regard to his radicular pain. Mr. Wenninger has also undergone various injections and physical therapy that also provided minimal relief. 12 weeks ago tried PRP, so far no change and possibly worse. Mr. Wenninger completely tore his left supraspinatus, with retraction, and tore his proximal biceps during 6/24 after falling down the stairs. Mr. Wenninger does not want any further spinal or shoulder surgery if at all possible.

He tries to keep himself moving. Uses Ice, uses back brace, knee brace and cane when up moving around. Uses heat occasionally. Elevates LE on ottoman while laying on his back or sits in Recliner with R LE supported with pillows. Unable to sleep in bed. Standing straight up causes poker sharp pain in mid of low back. Even hard to eat at table.

Sitting leaning to L with R LE stretched out straight avoiding hip and knee flexion. Standing leaning on wall limited weight bearing on R LE. Cane in R hand. Walking/pacing with cane. Requests to get out of chair and lie on his back on floor after BP check and medical histroy [sic] review . . .

**Non-Material Handling**

**Walking**
Mr. Wenninger demonstrated the ability during walking testing, to perform this activity on an AVOID basis. The US Army regulation time for a fast paced walking testing is 66 seconds and he was able to complete this test in 235 seconds so it could be considered that he performed walking testing at a slow pace. During this test, he did utilize an assistive device, his stride pattern was uneven, he did wear a

splint, he exhibited a right antalgic gait pattern and he did exhibit a pain behavior of holding during fast paced walking. Following this test, his heart rate was 98 beats per minute and his pain using the OccuPro functional pain scale was reported at a 8 on this 0-10 functionally based pain scale. The limiting factors noted during this test were increased pain, gait impairment and inadequate strength.

Mr. Wenninger reports an increase in pain symptoms during and/or following this test.
- His heart rate did increase accordingly.
- He did exhibit an associated pain behavior.
- He did exhibit an associated mechanical change.

Mr. Wenninger reported an increase in pain symptoms and the clinical objective findings support a reliable pain report. Unable to finish test after 150 feet with back brace, knee brace and cane. 3min 55 sec, needed a sitting break after 75feet, uncomfortable in the chair, shifting, leaning back, leaning to the L.
135/87 bp
respirations 25 bpm
O2sat 95% . . .

**Sitting and Standing**

**Sit/Stand Comments**
Sitting and standing abilities are based on observing this person's sit/stand abilities throughout this evaluation and comparing this to various questions asked of Mr. Wenninger.

During this evaluation Mr. Wenninger was noted to sit for a total of 5 minutes and before requiring a change of position he was noted to sit for 30 minutes at one time. During this evaluation Mr. Wenninger was noted to stand for a total of 30 minutes and before requiring a change of position he was noted to stand for 5 minutes at one time.

> Based on sitting observation and taking into account full time work he is able to perform sitting for up to 45 minutes total during a work day and 5 minutes at one time before requiring a change of position.
>
> Based on standing observation and taking into account full time work he is able to perform standing for up to 30 minutes total during a work day and 5 minutes at one time before requiring a change of position. Following this test, his heart rate was 85 beats per minute and his pain using the OccuPro functional pain scale was reported at a 8 1/2 on this 0-10 functionally based pain scale.

(Ex. 6 of 1/2/26 Administrative Appeal).

58) Mr. Wenninger had a lumbar MRI on 8/12/25, which CD was provided to LF. (Ex. 1a of 1/2/26 Administrative Appeal).

59) On 8/25/25, Mr. Wenninger treated with Dr. Bonnette for ongoing low back pain, right leg weakness, and left shoulder pain. (Ex. 7 of 1/2/26 Administrative Appeal).

60) Also, on 8/25/25, Dr. Bonnette wrote a detailed report on Mr. Wenninger's behalf in which he described Mr. Wenninger's history, objectively verified conditions, treatment, and disabled status:

> Eric was first seen in our clinic on 11/3/23 for evaluation and management of his low back pain. The patient's low back and right leg symptoms began in late 2022. He was previously seen by Dr. Polina who recommended therapy and performed multiple injections with minimal relief in symptoms. He then

underwent a discectomy/hemilaminectomy with Dr. D'Andrea on June 26, 2023. Unfortunately, he did not receive significant benefit with this surgery. In November of 2023, he underwent transforaminal epidural injections at the L3-4 and L4-5 levels on the right with only mild benefit in symptoms. In January of 2024, he underwent an interlaminar epidural injection with less improvement than the transforaminal injections. The patient attempted working with PT in early 2024 with no significant improvement. His low back and radicular symptoms slowly worsened throughout 2024 and required treatment of his symptoms with hydrocodone-acetaminophen, pregabalin, and tizanidine. We have recommended a spinal cord stimulator/neuromodulation but he decided against this treatment as he was hesitant regarding this procedure and not comfortable moving forward. He consulted with Dr. Fiani (Neurosurgery) who discussed and recommended a new surgical intervention, but the patient decided against moving forward with further surgical intervention. He consulted with Dr. Moosavi regarding regenerative treatments and the patient proceeded with these treatments on 3/26/26 with minimal improvement in symptoms. We last followed up in June of 2025 and his symptoms remained severe in the low back and right lower extremity.

The patient's L-Spine MRI (8/30/23) noted continued moderate foraminal stenosis at the L3-L4 and L4-L5 despite prior surgical intervention with continued bulging of the disc and a right foraminal protrusion type herniation.

Additionally, during the course of his back and leg symptoms, he sustained a fall on Easter 2024 which resulted in left shoulder pain and a rotator cuff tear. We referred the patient to Dr. Nate Marshall for further evaluation and management of his shoulder pain . . .

> After this Functional Capacity Evaluation, he was again evaluated in the clinic on 8/25/2025 and reviewed his recent MRI which was similar to his prior imaging in 2023. His symptoms remained consistent with his prior evaluations.
>
> Due to his continued symptoms without significant improvement with multiple conservative and interventional treatments as well as the new functional capacity evaluation, I find the patient's prognosis for any significant improvement to be poor.
>
> In multiple prior restriction forms provided by Lincoln Financial Group, I noted the patient to be able to perform Sedentary work. This form asked me to check a box to indicate what my patient is capable of on a full time basis and I checked the box next to Sedentary. Unfortunately, this form does not allow for any options of functioning less than Sedentary, so I checked the lowest level of functioning provided on this form, but if there were a lower level of function (i.e. patient cannot perform Sedentary work), I would have checked that box.
>
> I agree with the results of the functional capacity evaluation, in that the patient cannot work at a Sedentary level on a full-time basis. Due to these findings and his persistent, continued symptoms over the last 2 years of evaluations, it is my opinion that the patient shall, more likely than not, remain totally and permanently disabled.

(Ex. 10 of 1/2/26 Administrative Appeal).

61) On 10/29/25, Mr. Wenninger treated with Dr. Bonnette who noted similar findings as in previous notes. (Ex. 7 of 1/2/26 Administrative Appeal).

62) Mr. Wenninger prepared a personal statement in which he expressed his history, current symptoms, and functional limitations. (Ex. 12 of 1/2/26 Administrative Appeal).

63) The internal notes contained within Mr. Wenninger's claim file did not include any life premium waiver notes.

64) As a part of Mr. Wenninger's 1/2/26 administrative appeal, he asked LF to confirm whether it maintained a separate file for the life insurance claim and, if so, to provide him with that file along with all internal notes. LF failed to address those questions/requests.

65) As part of its appeal review, LF sent Mr. Wenninger's records to Solomon Rojhani, M.D. (PM&R) who, on 1/20/26, noted:

> **1. Please identify the primary impairing Diagnosis(es) with ICD 10 Code(s). Codes are only needed on up to the first 3 diagnoses.**
>
> [A]. Radiculopathy, lumbar region M54.16
> Low back pain M54.16
> Chronic pain syndrome G89.4
>
> **3. Taking into consideration the entire clinical picture, including evidence based medicine and any medication or other treatment side effects, please describe how any supported level of impairment translates into restrictions and limitations from 7/18/2025 to present and ongoing, and comment on the expected duration.**

[A]. Yes, taking into consideration the entire clinical picture, including evidence-based medicine and any medication or other treatment side effects, there is a supported level of impairment that translates into restrictions and limitations from 7/18/2025 to present and ongoing . . .

In a functional capacity evaluation done on 07/07/2025, the provider noted that the claimant is unable to work full-time even in a sedentary capacity due to the inability to walk occasionally, stand for 1 hour and 45 minutes, sit for approximately 6 hours of an 8- hour workday, and sit at least 2 hours at a time. The provider also noted the claimant should avoid the following in a competitive work environment: sitting, walking, pinching, simple grasping, fine coordination, gross coordination, forward reaching, above shoulder reach, lifting, pushing, pulling, bending, squatting, sustained kneeling, repetitive kneeling, crawling, static balance, and dynamic balance.

Overall, the claimant has a medical history significant for radiculopathy in, lumbar region, low back pain, left shoulder pain, left supraspinatus full-thickness tear, and chronic pain syndrome. Regarding the condition of left shoulder pain and left supraspinatus full-thickness tear, I am unable to evaluate restrictions and limitations for these conditions due to a lack of information relating to these conditions within the timeframe for review.

For the claimant's radiculopathy in, lumbar region, low back pain, and chronic pain syndrome, these conditions are functionally impairing as the claimant consistently reported low back pain despite multiple interventions. Clinical evidence includes tenderness in the bilateral lumbar paraspinals, restricted lumbar flexion and extension, intact lower extremity strength, non-antalgic gait, and positive lumbar facet loading and straight leg raise (right) tests (05/07/2025, 06/25/2025, and

10/29/2025). These findings support restrictions to maximize the claimant's residual functional capacity. Therefore, the following restrictions and limitations are supported:

Sitting: Constantly, with frequent postural changes
Standing: Occasionally, with the aid of a lumbar brace
Walking: Occasionally, with the aid of a lumbar brace
Lifting: Occasionally, up to l0lbs., BUE.
Carrying: Occasionally, up to l0lbs., BUE.
Pushing: Occasionally, up to l0lbs., BUE.
Pulling: Occasionally, up to l0lbs., BUE.
Climbing stairs: Occasionally, with the aid of a lumbar brace
Balancing: Occasionally
Stooping: Occasionally
Kneeling: Occasionally
Crouching: Occasionally
Crawling: Occasionally
Reaching: Unrestricted to above head and below waist levels, BUE; Occasionally, below waist, BUE
Using lower extremities for foot controls: Unrestricted LLE; Occasionally RLE
Fine manipulation: Unrestricted BUE
Simple and firm grasping: Unrestricted BUE

No climbing ladders
No operation of heavy machinery
Allow use of ergonomic chair with appropriate lumbar support

The above-recommended restrictions and limitations are supported from 7/18/2025 to present and ongoing, with reassessment on or around 07/13/2026

**4. Do medical records support any restrictions and limitations that were recommended by treating providers for the timeframes in question?**

[A]. There were no restrictions and limitations that were recommended by the treating provider for the time frame in question.

**7. Do the medical records support that the claimant be restricted or limited from obtaining any type of employment at the present time (ie. in a different environment, employer, or occupation)?**

[A]. No, the medical records do not support that the claimant be restricted or limited from obtaining any type of employment at the present time. The records demonstrate impairment due to lumbar radiculopathy, low back pain, and chronic pain syndrome, resulting in significant limitations for tasks involving prolonged standing or walking, heavy lifting, pushing/pulling, and repetitive trunk movements. While significant restrictions are warranted, the evidence does not indicate total incapacity to obtain any type of employment at this time.

(Claim File).

66) Dr. Rojhani ignored the 7/7/25 FCE's findings, particularly those pertaining to Mr. Wenninger's residual physical/functional capacity - lack thereof - to sit throughout an 8-hour workday. (Claim File & Ex. 6 of 1/2/26 Administrative Appeal).

67) Dr. Rojhani ignored Dr. Bonnette's opinions supporting ongoing disability, particularly those he offered on 3/6/25 and 8/25/25.

68) Dr. Rojhani incorrectly stated that none of Mr. Wenninger's treating provider(s) imposed restrictions and limitations beginning 7/18/2025 going forward. (Claim File). Dr. Bonnette imposed restrictions and limitations beginning 1/14/24 and beyond. (Ex's 4, 7, & 10 of 1/2/26 Administrative Appeal & Claim File).

69) On 1/26/26, LF conducted another Transferrable Skills Analysis in which Nicole H., MS, CRC determined that Mr. Wenninger could work as a Packaging Engineer, Quality-Control Supervisor, Scheduler, Maintenance, and Expediter. (Claim File).

70) On 1/27/26, LF provided Mr. Wenninger with copies of Dr. Rojhani and Nicole H.'s reports for review and comment.

71) On 2/3/26, Dr. Bonnette responded to Dr. Rojhani's 1/20/26 opinions as follows:

> Upon review of Eric's recent Peer Review performed by Dr. Solomon Rojhani, I respectfully disagree with his interpretation of the records provided to him. Most notably with his answers in questions numbered 3 and 4.
>
> In Dr Rojhani's response to question #3, he notes that the functional capacity evaluation performed on 7/7/25 reviewed the patient is 'unable to work full time even in a sedentary capacity due to the inability to walk occasionally, inability to stand for 1 hour and 45 minutes, inability to sit for 6 hours of a day, and inability to sit for 2 hours consistently at a time.' Two

> paragraphs later, he notes that the patient can sit consistently with frequent postural changes. I do not believe this recommendation is congruent with the patient's functional capacity evaluation nor with his presentation. I understand that Dr. Rojhani did not have the benefit of an [sic] any type of exam or evaluation the patient, but in each of my prior visits, the patient is unable to sit throughout the 15 minute office follow up visit and requires frequent positional changes from sitting to standing, and in some cases laying down during his visits due to his continued significant pain symptoms.
>
> In Dr. Rojhani's response to question #4, he notes that ’no restrictions and/or limitations were recommended for the time frame in question.’ I am not sure what documents, Dr. Rojhani had access to, but I have completed multiple prior Restriction forms that were requested by Lincoln Financial, which I will attach to this document. The Restriction Form provided by Lincoln Financial does not allow for an option of total incapacity, so I marked the sedentary box as it was most applicable.
>
> Once I received the functional capacity evaluation, I provided an updated narrative review to explain the extent and status of his symptoms and recommendations for restrictions that can be reviewed in the attached document as well.

(Claim File).

72) On 2/13/26, LF denied Mr. Wenninger’s administrative appeal. It also failed to address Mr. Wenninger’s life premium waiver.

### B. Incorrect Benefit Calculation (salary and benefit percentage), Overpayments & Damages

73) Beginning 7/19/23 through roughly 1/17/25, LF miscalculated calculated Mr. Wenninger's gross LTD benefit based on inaccurate earnings and an inaccurate benefit percentage:

- $5,362.81 (- $769.92) (7/19/23 – 8/18/23)
- $4,596.70 (8/19/23 – 9/18/23)
- $4,596.70 (9/19/23 – 10/18/23)
- $4,596.70 (10/19/23 – 11/18/23)
- $4,596.70 (11/19/23 - 12/18/23)
- $4,596.70 (12/19/23 – 1/18/24)
- $4,596.70 (1/19/24 – 2/18/24)
- $4,596.70 (2/19/24 – 3/18/24)
- $4,596.70 (3/19/24 – 4/18/24)
- $4,596.70 (4/19/24 – 5/18/24)
- $4,596.70 (5/19/24 – 6/18/24)
- $4,596.70 (6/19/24 – 7/18/24)
- $4,596.70 (7/19/24 – 8/18/24)
- $4,596.70 (8/19/24 – 9/18/24)
- $5,362.81 (- $2,951.00 SSD) (9/19/24 – 10/18/24)
- $5,362.81 (- $2,951.00 SSD) (10/19/24 – 11/18/24)
- $5,362.81 (- $2,951.00 SSD) (11/19/24 – 12/18/24)
- $5,362.81 (- $2,951.00 SSD) + $476.07 (12/19/24 – 1/18/25)
- $5,838.88[2] (- $2,951.00 SSD) (1/19/25 – 2/18/25)
- $5,362.81 (- $2,951.00 SSD) (2/19/25 – 3/18/25)

(Claim File).

74) On 7/25/23, LF contacted Mr. Wenninger's employer (Fisher Dynamics ("Fisher")) to verify his salary. (Claim File; claim note 13).

75) On 8/1/23, LF received the following information from Fisher:

[2] This benefit was calculated correctly.

> MONAHAN, JACKIE] SET UP SCHEDULED PAYMENT FROM 07/19/2023 THROUGH 07/18/2025 BASED ON W2 $7661.16 BME. THE BENEFIT IS 60% OR $4,596.70. MAX BEN DATE CALCULATE AT 02/10/2033. OFFSET(S) SET UP AS FOLLOWS: SHTM 07/19 - 07/20/23 IN FLAT AMOUNT $769.92, PER ER EMAIL IN DOC LIST. THE INITIAL PAYMENT WORKSHEET HAS BEEN SAVED TO THE DOC LIST.

(Claim File; claim note 14).

76) On 12/26/23, an LF representative spoke to Mr. Wenninger about applying for Social Security Disability ("SSD") and advised him that a referral had been made to Claimify for assistance in that regard. (Claim File; claim note 27).

77) On 1/17/24, an LF representative noted that Mr. Wenninger's records had been forwarded to Claimify. (Claim File; claim note 29).

78) On 1/19/24, Mr. Wenninger confirmed to LF that he had filed an SSD claim with Claimify on that date. (Claim File; phone note 12).

79) On 1/24/24, LF noted that Mr. Wenninger's initial SSD application was filed on 1/19/24. (Claim File; claim note 32).

80) On 4/12/24, Mr. Wenninger informed LF that he wanted taxes to be deducted from his monthly LTD benefit. (Claim File; phone note 19).

81) On or about 7/19/24, Claimify advised LF that Mr. Wenninger's SSD application was still pending. (Claim File; claim note 47).

82) On 9/26/24, Claimify informed LF that Mr. Wenninger's SSD claim had been approved. (Claim File; overpayment note 1 & claim file note 57).

83) On 9/26/24, LF noted: "THE SCORE REFERRAL FOR FINANCIAL REVIEW SERVICES REFERRAL AND SOCIAL SECURITY DISABILITY INCOME (SSDI) HAS BEEN RECEIVED AND ASSIGNED TO MERANDA BOHLE." (Claim File; claim note 59).

84) On 10/1/24 and 10/2/24, LF calculated Mr. Wenninger's SSD overpayment and notified Mr. Wenninger as follows:

> Text: [10/01/2024 - BOHLE, MERANDA] THE OVERPAYMENT DUE IS $31,354.57 FOR THE PERIOD OF 07/19/23 THRU 09/18/24. EMPLOYEE WAS ORIGINALLY PAID $64,349.99. PAY WAS RECALCULATED DUE TO SS DISABILITY AND EMPLOYEE SHOULD HAVE BEEN PAID $32,995.42. TOTAL OVERPAYMENT BALANCE DUE IS $31,354.57. EMPLOYEE OWES $31,354.57 AND VENDOR OWES $0.00 FOR EXCESS FEES. DETAILED OP LETTER SENT TO EMPLOYEE AND OVERPAYMENT INFORMATION EMAILED TO VENDOR. FOLLOW UP SET FOR REPAYMENT. RECOVERY STRATEGY: EMPLOYEE ELECTED EFT WITH CLAIMIFY AND LINCOLN.

(Claim File (overpayment notes 3 & 4) & Ex. 1 of Complaint).

85) On 10/11/24, Mr. Wenninger emailed LF asking: "Can you please send me the calculations form or document used to determine my original monthly LTD payment amount? I don't recall receiving this information." (Ex. 2 of

Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

86) On 10/14/24, LF noted that it sent Mr. Wenninger the calculation information he requested. (Claim File (claim note 61) & Ex. 3 of Complaint).

87) In response to Mr. Wenninger's 10/15/24 message regarding his benefit calculation and LF's claimed overpayment, LF called Mr. Wenninger on the same date to discuss his concerns:

> [10/15/2024 - BOHLE, MERANDA] PLACED CALL TO CLAIMANT @ 586-745-7168; CLAIMANT ADVISED HE HAS QUESTIONS REGARDING HOW THE OVERPAYMENT WAS CALCULATED. FRS ADVISED THAT THE OVERPAYMENT WAS CALCULATED BASED ON THE MONTHLY BENEFIT AMOUNT HE IS RECEIVING FROM SSA. FRS ADVISED WITHOUT THE OFFSET HE WAS RECEIVING $4,596.70. HOWEVER, ONCE AN OFFSET IS ON THE CLAIM HIS BENEFIT INCREASED TO $5,362.81. THEREFORE, REDUCING THE TOTAL OVERPAYMENT. CLAIMANT INQUIRED HOW THE BENEFIT AMOUNT IS DETERMINED. FRS ADVISED PSU CALCULATES THE INITIAL BENEFIT. HOWEVER, IT APPEARS IT IS CALCULATED BASED ON THE MONTHLY SALARY AMOUNT OF $7661.16. CLAIMANT ADVISED HE BELIEVES THIS IS INCORRECT AS IT IS BASED ON THE NET AMOUNT HE MADE VS THE GROSS AMOUNT. FRS ADVISED FRS CAN REACH OUT TO PSU. CLAIMANT INQUIRED ABOUT REPAYMENT FOR THE OVERPAYMENT. FRS ADVISED CLAIMANT WAS WORKING WITH CLAIMIFY. THEREFORE, CLAIMANT CAN REACH OUT TO CLAIMIFY TO COMPLETE THE PAYMENT. CLAIMANT ADVISED HE WOULD LIKE TO WAIT UNTIL PSU REVIEWS HIS BENEFIT AS IF HE IS ALLOTTED AN UNDERPAYMENT DUE TO AN INCORRECT BENEFIT AMOUNT THEN THIS COULD REDUCE THE TOTAL OVERPAYMENT. FRS ADVISED THAT FRS WILL REACH OUT TO PSU.

(Claim File; overpayment note 5).

88) On 10/22/24, LF returned Mr. Wenninger's call regarding the status of his benefit calculation and overpayment review:

> BOHLE, MERANDA] PLACED CALL TO CLAIMANT @ (586) 745-7168; ADVISED CALLING IN REGARDS TO VOICEMAIL. FRS ADVISED FRS IS WAITING TO HEAR BACK FROM PSU. FRS ADVISED ONCE A RESPONSE IS RECEIVED FRS WILL BE IN TOUCH. CLAIMANT ADVISED HE MUST REPAY BY TODAY; HOWEVER, HE WOULD LIKE TO WAIT UNTIL BENEFIT IS RESOLVED. FRS ADVISED THAT IS FINE. FRS WILL NOTATE IN CLAIMANT'S FILE.

(Claim File; overpayment note 6).

89) On 11/14/24, LF emailed Mr. Wenninger the following: "I just wanted to reach out and touch base regarding your claim listed above. I spoke with payment services, and they are still trying to confirm with your employer the correct amount to use for your basic monthly earnings." (Ex. 2 of Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

90) On 12/9/24 (10:42 a.m.), Mr. Wenninger emailed LF to inquire about the status of his benefit calculation: "Meranda, any update on this? I am getting a bit concerned that it is taking this long. Do you have an update?" (Ex. 2 of Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

91) On 12/9/24 (1:14 p.m.), LF returned Mr. Wenninger's call regarding the status of his benefit calculation and overpayment:

> BOHLE, MERANDA] PLACED CALL TO CLAIMANT @ 586-745-7168; ADVISED CALLING PER VOICEMAIL RECEIVED. CLAIMANT ADVISED THAT HE IS INQUIRING ABOUT AN UPDATE. FRS ADVISE THE LAST RESPONSE FROM PSU WAS FROM 11/14/2024. HOWEVER, FRS SENT AN EMAIL TO PSU ON 11/26/2024 AND ANOTHER TODAY. FRS ADVISED WILL UPDATE CLAIMANT ONCE A RESPONSE IS RECEIVED.

(Claim File; overpayment note 9).

92) On 12/18/24 (10:39 a.m.), Mr. Wenninger emailed LF asking for an update: "Meranda, just checking back to see what's the status on this? Doesn't seem right that it is taking this long to recalculate my check and correct the previous error. Has this been escalated?" (Ex. 2 of Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

93) On 12/20/24 (7:26 a.m.), LF noted the following in connection with its benefit and overpayment review:

> Text: [12/20/2024 - GOODRICH, KAYLA] PS MNGR REVIEWED CONTRACT DEFINITION OF BASIC MONTHLY EARNINGS WHICH STATES IT ME [sic] AND THE COVERED PERSONS MONTHLY RATE OF EARNINGS AS FIGURED FROM THE INCOME BOX ON THE W2 FORM WHICH REFLECTS WAGES, TIPS, AND OTHER COMPENSATION. THIS INFORMATION IS EXACTLY WHAT WAS USED TO CALCULATE THE SALARY FOR THIS CLAIM. THE

> CUSTOMER AND THE CLAIMANT BOTH ARE DISPUTING THE SALARY SHOULD BE BASED ON THE BASE ANNUAL SALARY. RECOMMENDED THAT ASM HOST A CUSTOMER CALL WITH FISHER AND COMPANY TO DISCUSS AND SUBMIT A RETROACTIVE CONTRACT UPDATE IF THIS IS THE COURSE OF ACTION THEY ELECT TO TAKE. **HOWEVER, THE SALARY CALCULATE IS CORRECT TODAY ACCORDING TO THE BASIC MONTHLY EARNINGS DEFINITION IN THE POLICY**. THEREFORE, IF EE FURTHER DISPUTES, RECOMMENDED THAT CASE MANAGER SEND APPEAL LETTER TO EE SO HE CAN SUBMIT A FORMAL APPEAL OF SALARY CALC. NO FURTHER ACTION IS NEEDED BY PSU AND/OR FRS UNTIL THIS IS RESOLVED BY THE CUSTOMER AND ASM.

(Claim File; claim note 73). (emphasis added).

94) On 12/20/24 (11:43 a.m.), LF emailed Mr. Wenninger: "I forwarded your email along to the PSU rep. They are still currently working on confirming your benefit amount, and *I am not sure when they will have a resolution. In the meantime, did you want to repay the overpayment due in the amount of $31,354.57*. Part of your overpayment is from 2024; therefore, if not repaid in 2024 your W2 will not be adjusted to reflect the portion repaid." (Ex. 2 of Complaint). (emphasis added). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

95) On 12/20/24 (5:24 p.m.), LF left Mr. Wenninger a voicemail, asking for a return call. (Claim File; overpayment note 10).

96) On 12/26/24 (1:28 p.m.), LF noted the following concerning Mr. Wenninger's overpayment-benefit calculation issue:

> Text: [12/26/2024 - BOHLE, MERANDA] PLACED CALL TO CLAIMANT @ (586) 745-7168; ADVISED CALLING IN REGARDS TO VOICEMAIL. **FRS ADVISED FRS SPOKE WITH PSU AND PSU INDICATED THAT THE SALARY CALCULATION WAS COMPLETED CORRECTLY. CLAIMANT ADVISED HE DOES NOT BELIEVE THIS WAS COMPLETED CORRECTLY, AND WOULD LIKE A BREAKDOWN OF HOW THE SALARY WAS DETERMINED**. FRS ADVISED IF CLAIMANT BELIEVES THIS IS INCORRECT, CLAIMANT CAN APPEAL THE SALARY DETERMINATION. FRS ADVISED WILL REACH OUT TO PSU TO ADVISE CLAIMANT WOULD LIKE A SALARY CALCULATION BREAKDOWN, AND ALSO APPEAL INFORMATION. *CLAIMANT ADVISED HE WOULD LIKE TO RESOLVE THE OVERPAYMENT; HOWEVER, HE WANTS TO ENSURE HIS SALARY WAS CALCULATED CORRECTLY*. FRS ADVISED NOTATED.
>
> FRS ADVISED CLAIMANT DOES HAVE A OVP FROM 2023 & 2024. **THEREFORE, IF OVP FROM 2024 IS NOT REPAID IN 2024 THEN HE WOULD RECEIVE A LETTER OF CREDIT FOR 2023 & 2024 INDICATING WHEN THE OVP WAS REPAID**. **HOWEVER, IF OVP IS REPAID IN 2024 HE WOULD RECEIVE A LETTER OF CREDIT FOR 2023 & HIS W2 FOR 2024 WOULD BE ADJUSTED ACCORDINGLY**. CLAIMANT UNDERSTOOD. CLAIMANT ADVISED HE IS GOING TO REACH OUT TO PSU, AND WILL RTC TO RESOLVE OVP.

(Claim File; overpayment note 11). (emphasis added).

97) LF again called Mr. Wenninger on 12/26/24 (3:42 p.m.) to discuss his concerns:

> Text: [12/26/2024 - MONAHAN, JAQUELINE] RETURNED CALL TO EE AND LINDA (SPOUSE), AS THEY FEEL THAT WE

> MISCALCULATED THE BENEFITS. SHE KEPT SAYING THAT WE DEDUCTED MEDICAL, 401K AND LIFE BY USING THE LOWER SALARY AMOUNT AS HE WAS NOT ELIGIBLE FOR THOSE BENEFITS AFTER STD ENDED. TRIED TO EXPLAIN IT STATE THAT THE BME DEFINITION IS WHAT WE USED TO CALCULATE - USING BOX 1 FOR WAGES, TIPS AND OTHER COMP; AND I ALSO EXPLAINED THAT ASM AND ER WERE WORKING TO DETERMINE IF THE CONTACT [sic] NEEDED TO BE CHANGED. EE AND SPOUSE REQUESTED PS MGR TO CALL TO DISCUSS CALCULATION AND FORWARDED URGENT EMAIL TO PS MGR TO REVIEW/CALL BACK.

(Claim File; phone note 33).

98) On 12/30/24, LF indicated that it sent Mr. Wenninger a letter explaining appeal language and "BME and benefit amount." (Claim File; claim note 74).

99) The 12/30/24 letter that LF sent Mr. Wenninger continued to misrepresent the manner in which it calculated his basic monthly earnings, e.g., based on his W-2; continued to misrepresent the correct benefit percentage (60% as opposed to 70%); and advised Mr. Wenninger of his appeal rights. LF also informed Mr. Wenninger that, if he wished, he could contact the Illinois Department of Insurance for further assistance. (Ex. 4 of Complaint).

100) Mr. Wenninger lives in Michigan, not Illinois, and the governing Policy was issued in Michigan.

101) On 1/6/25, LF noted the following regarding the ongoing overpayment and correct benefit calculation issue: "[01/06/2025 - RIPPETT, LISA] RTC TO EE RE VM LEFT FOR DCM RE PAYMENT CALC. ADVISED WAS COPIED ON EMAIL RE A MEETING BETWEEN ER AND LFG THIS WEEK SO AS SOON AS WE HAVE MORE INFO EITHER PAYMENTS OR DCM WILL RTC." (Claim File; phone note 34).

102) On 1/22/25 (1:22 p.m.), Mr. Wenninger emailed LF asking: "Meranda, Lisa and Jaqueline, there was a meeting held a few weeks ago with the payment team and HR @ Fisher to discuss the error with calculating my LTD payment check. Can you kindly confirm what came of that meeting?" (Ex. 2 of Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

103) On 1/30/25 (1:39 p.m.), Mr. Wenninger emailed LF asking for an update. (Ex. 2 of Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

104) On 1/30/25 (1:38 p.m.), LF noted: "CALL FROM CLAIMANT IN REGARDS: TO BENEFIT CALCULATION. FRS ADVISED IT APPEARS THEY ARE STILL WORKING ON THIS ISSUE. FRS ADVISED WILL REACH OUT TO PSU TO ADVISE AN UPDATE IS NEEDED." (Claim File; overpayment note 12).

105) On 1/30/25 (2:34 p.m.), LF noted:

> Other Subject : **BENEFIT CALC *WRONG***
> Text: [01/30/2025 - MONAHAN, JAQUELINE ] PER UPDATED ER EMAIL, SALARY SCREENSHOT IN DOC LIST: UPDATED BME BASED ON SALARY SCREENSHOT IN DOC LIST EFF 07/02/22 INDICATES ANNUAL $100.095.00 / 12 = $8341.25 BME. THE BENEFIT IS 60% OR $5,004.75. MAX BEN DATE CALCULATE AT 02/10/2033. THE INITIAL PAYMENT WORKSHEET HAS BEEN SAVED TO THE DOC LIST. **RECALCULATION TO FRS FOR 07/19/2023 THRU 01/18/2025** [01/31/2025 - MONAHAN, JAQUELINE].

(Claim File; claim note 78). (emphasis added).

106) Also, on 1/30/25 (2:37 p.m.), LF emailed Mr. Wenninger information that continued to be incorrect: "I have updated the salary on your claim – future benefits will issue at a Gross Benefit $5004.75 less SS offset $2951.00 = Adjusted Net benefit $2887.88, with your next payment issuing 02/12/25. Also, I have requested a recalculation of benefits for period 07/19/2023 thru 01/18/2025, once that is completed a check for the underpayment on your claim will be issued by our FRS Department." (Ex. 2 of Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

107) On 1/30/25 (3:22 p.m.), Mr. Wenninger emailed LF to advise that it had still incorrectly calculated his earnings and benefit:

> Jaqueline, the paycheck calculation is still not correct and you have not accounted for the 10% offset (applied at SS award). Your new calculation has reduced my paycheck award which is absolutely incorrect. Below is the spreadsheet showing the

> incorrect calculation and the correct calculation. I would like to understand how you derived @ $5004.75 (need to see the math). Please let me know when you are available to walk through this.

(Ex. 2 of Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

108) On 1/30/25 (8:50 p.m.), LF indicated: "FOR A SYSTEM CORRECTION. COMMENTS: BME UPDATED, PLEASE RECALC 07/19/2023 THRU 01/18/2025 AND ISSUE UP TO EE. THANKS!" (Claim File; claim note 79).

109) On 1/30/25 (8:51 p.m.), LF noted: "THE SCORE REFERRAL FOR FINANCIAL REVIEW SERVICES REFERRAL AND SYSTEM CORRECTION HAS BEEN RECEIVED AND ASSIGNED TO HILLARY CLARKE." (Claim File; claim note 80).

110) On 1/31/25 (7:15 a.m.), LF noted: "[CLARKE, HILLARY] THE OVERPAYMENT BALANCE OF $31354.57 NEEDS TO BE MODIFIED OR CHANGED DUE TO ADDITIONAL INFORMATION. OVP NEEDS TO BE ADJUSTED DUE TO SALARY RECALC." (Claim File; overpayment note 13).

111) On the same day and time as the preceding paragraph, LF noted: "[CLARKE, HILLARY] REFERRAL RECEIVED TO RECALCULATE BENEFITS DUE TO SYSTEM CORRECTION. F/U SET TO COMPLETE THE CALC. [02/04/2025 - BOHLE,

MERANDA] ON BEHALF OF HILLARY CLARKE; REJECTED REFERRAL DUE TO OPEN RECORD. CALC HAS BEEN COMPLETED. **." (Claim File; overpayment note 14).

112) On 1/31/25 (10:46 a.m.), LF noted: "[01/31/2025 - MONAHAN, JAQUELINE] ** CORRECTION PER ER UPDATED SALARY - BASED ON SALARY SCREENSHOT IN DOC LIST EFF 07/02/22 INDICATES ANNUAL $100.095.12 / 12 = $8341.26 BME. THE BENEFIT IS 60% OR $5,004.76. MAX BEN DATE CALCULATE AT 02/10/2033. THE INITIAL PAYMENT WORKSHEET HAS BEEN SAVED TO THE DOC LIST. ***FRS REFERRAL SENT TO RECALCULATE FOR PERIOD 07/19/2023 THRU 01/18/2025***." (Claim File; claim note 81).

113) On 1/31/25 (11:21 a.m.), LF (Ms. Monahan) emailed Mr. Wenninger:

> Hello Eric,
>
> **I want to apologize as I did not realize that your benefit was 70%, which it does show that in our system and sorry for any confusion**. I have reviewed your salary and calculation with my manager and the correct calculation is as follows:
>
> ANNUAL Salary provided by the Employer: Semi-Monthly Salary $4170.63 x 24 period = Annual $100,095.12 / 12 months = $8341.26. Then with that 70% benefit = $5838.88 less SS Offset $2951.00 = Adjusted Gross Benefit $2887.88.
>
> The Basic Monthly Earnings definition is a Contract update retroactive to 01/01/2023, that uses the salary in effect immediately prior to the Disability date; we will not use any amounts from the W2 (which was the prior Basic Monthly Earnings definition). And I

> believe that is where you obtained the $100,843.84 amount. Please let me know if you have any further questions.

(Ex. 2 of Complaint). (emphasis added).

114) On 1/31/25 (2:37 p.m.), LF noted that the $31,354.57 was to be modified due to new information. (Claim File; overpayment note 15).

115) On 1/31/25 (6:25 p.m.), Mr. Wenninger emailed LF requesting information:

> In addition to sending me the updated contract and complete policy, can you also send me the revised payment set up worksheet form (screen grab below.) As well as the updated calculation worksheet (also below). I would like to review the revised calculations before you send a check. I am going to assume whatever was underpaid will be deducted from what I owe from the SS award. Can we please keep the communication open regarding this matter until it is completely finalized?

(Ex. 2 of Complaint).

Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

116) On 1/31/25 (9:10 p.m.), LF noted that the $31,354.57 overpayment was removed. (Claim File; overpayment note 16).

117) On 2/4/25, LF revised Mr. Wenninger's overpayment as follows:

> - BOHLE, MERANDA] THE OVERPAYMENT DUE IS $22,785.31 FOR THE PERIOD OF 07/19/23 THRU 01/18/25. CLAIMANT WAS ORIGINALLY PAID $73,997.23. PAY WAS RECALCULATED

> DUE TO SS DISABILITY AND CLAIMANT SHOULD HAVE BEEN PAID $51,211.92. **TOTAL OVERPAYMENT BALANCE DUE IS $22,785.31**. CLAIMANT OWES $22,785.31 AND VENDOR OWES $0.00 FOR EXCESS FEES. DETAILED OP LETTER SENT TO CLAIMANT. FOLLOW UP SET FOR REPAYMENT. [02/04/2025 - BOHLE, MERANDA]** ADJUSTED CHECK #113589047 BY $280.61 TO AVOID ISSUING A MANUAL PAYMENT ON CHECK #113850137, 114103604, & 114359089. ** [02/04/2025 - BOHLE, MERANDA]** ISSUED MANUAL PAYMENT IN THE AMOUNT OF $476.07 FOR 12/19/2024 - 1/18/2025 AND APPLIED TO OVP. TOTAL OVP BALANCE DUE IS $22,785.31. **

(Claim File; overpayment note 17 & Ex. 5 of Complaint). (emphasis added).

118) Mr. Wenninger reimbursed LF $22,785.31 on 2/19/25 via electronic payment. (Claim File; overpayment note 18).

119) On 2/28/25, Mr. Wenninger emailed LF to obtain the updated Policy. (Ex. 2 of Complaint). Upon information and belief, this email was not a part of the claim file that LF provided to Mr. Wenninger.

120) Mr. Wenninger began questioning LF's figures on 10/11/24 and diligently followed up to try and secure an answer by the end of 2024 so he could receive an adjusted W-2.

121) LF repeatedly told Mr. Wenninger beginning approximately 10/14/24 through 1/30/25 that its calculations were correct when, in fact, they were not.

122) By not correcting its error by the end of 2024, LF deprived Mr. Wenninger of the ability to pay the correct overpayment for 2024.

123) By not reimbursing LF's overpayment in 2024, Mr. Wenninger was unable to receive an adjusted W-2 for that year.

123) On 4/15/25, Mr. Wenninger emailed LF, inquiring about an amended W-2: "Can you send me an amended W2 regarding the give back funds as a result of the social security disability award? This affects my tax return for both 2023 and 2024 and I am going to need to file an amended tax return for both years since my sick pay was less than originally reported." (Ex. 6 of Complaint).

124) On or about 4/16/25, LF advised Mr. Wenninger that it would not issue an adjusted W-2 because the overpayment that occurred during 2023 and 2024 was not satisfied until 2025. Instead, a "letter of credit" would be provided during 2026, which **may** allow him to claim a repayment credit on 2025 taxes. (Ex. 6 of Complaint). (emphasis added).

125) On 1/28/26, LF provided Mr. Wenninger with the following "letter of credit":

> **RE: NOTIFICATION OF REPAYMENT/REFUND DATA FOR INCOME TAX PURPOSES**
>
> You received overpayments of disability benefits under your employer's group disability plan. We determined that you were not entitled to certain of those benefits and you returned part or all of the overpayment to us in 2025. The *taxable* amounts of the overpayment you returned to us in 2025,

> which is applicable to payments you had received prior to 2025, are shown on the reverse page.
>
> If you included the overpayment of disability benefits received on your prior years' federal income tax returns, you may be able to take a credit or deduction in the tax year of repayment for the repaid amounts. Please consult with your tax advisor or refer to IRS Publication 525 "Repayments" before taking any action.
>
> REPAYMENTS/REFUNDS FOR TAXABLE BENEFITS PAID PRIOR TO 2025:
>
> | Tax Year | Amount |
> |---|---|
> | 2023 | $9,310.21 |
> | 2024 | $13,951.17 |
>
> TOTAL REPAYMENTS/REFUNDS CREDITS: $23,261.38.

(Ex. 7 of Complaint).

126) Mr. Wenninger maintains that LF's errors and failure to timely correct them during 2023 and 2024 caused him unnecessary and avoidable adverse tax consequences.

127) Between LF's miscalculation of Mr. Wenninger's earnings and benefit percentage and the portion of the SSD overpayment applied to 2023, Mr. Wenninger paid $1,675.00 in federal taxes when he should have received a $411.00 refund. (Ex. 8 of Complaint).

128) Between LF's miscalculation of Mr. Wenninger's earnings and benefit percentage and the portion of the SSD overpayment applied to 2023, Mr. Wenninger paid $708.00 in state taxes when he should have paid $330.00. (Ex. 8 of Complaint).

129) Between LF's miscalculation of Mr. Wenninger's earnings and benefit percentage and the portion of the SSD overpayment applied to 2024, Mr. Wenninger paid $9,826.00 in federal taxes when he should have paid $4,172.00. (Ex. 9 of Complaint).

130) Between LF's miscalculation of Mr. Wenninger's earnings and benefit percentage and the portion of the SSD overpayment applied to 2024, Mr. Wenninger paid $1,157.00 in state taxes when he should have paid $564.00. (Ex. 9 of Complaint).

131) Mr. Wenninger maintains that LF must provide him (should have provided) with an adjusted W-2, at the very least for 2024, because of its errors, and failure to timely correct those errors by the end of 2024, which caused Mr. Wenninger to suffer an avoidable $6,247.00 tax liability.

132) In addition to the LTD benefits that Mr. Wenninger believes are due, LF also owes him $10,102.89, which represents the adverse tax consequences he

was assessed, interest on the benefits that LF failed to pay, and, ***as of the date of this Complaint's filing***, interest on the monies Mr. Wenninger repaid LF:

> Interest owed for money held back and overpayment in taxes for 2023 and 2024:
>
> $18,529.00 LF erroneously withheld from 18 monthly paychecks @ 4.0% interest = $587.00.
>
> $6,247.00 overpaid in taxes for 2024 for money that Mr. Wenninger did not keep, as $13,951.00 was not included in his LTD benefits.
>
> $2,464.00 overpaid in taxes for 2023 for money that Mr. Wenninger did not keep, as $9,310.21 was not included in his LTD benefits.
>
> $6,247.00 overpaid in taxes for 2024 @ 4.0% interest for 14 months totals $292.49.
>
> $2,464.00 overpaid in taxes for 2023 @ 4.0% interest for 20 months totals $166.45.
>
> Mr. Wenninger also incurred a $345.95 tax penalty.
>
> LF owes Mr. Wenninger $10,102.89 above and beyond LTD benefits.

133) Mr. Wenninger maintains that he is entitled to $587.00 in interest for the $18,529.00 that he was underpaid beginning 7/19/23 through 1/18/25.

134) Mr. Wenninger incurred a $345.95 tax penalty due to LF's errors for which he wants to be reimbursed.

135) Mr. Wenninger's correct gross LTD benefit is $5,838.88. After LF offsets his monthly $2,951.00 SSD benefit, its net liability has been reduced to $2,887.88 per month.

136) Based on the preceding, Mr. Wenninger asserts that LF's actions have now foreclosed all avenues of administrative appeal and this matter is ripe for judicial review.

137) Valid, objective, and well-supported medical evidence establishes that Mr. Wenninger is and shall, more likely than not, remain totally and permanently disabled per the Policy. He is entitled to LTD benefits retroactive to 7/19/25 through the Policy's maximum benefit period, believed to be 02/10/2033. Mr. Wenninger maintains that he is also entitled to a total disability life premium waiver/extended death benefit as well as the monetary damages described above as a result of LF's errors.

**WHEREFORE**, based upon the preceding reasons, Mr. Wenninger prays for the following relief:

A) That this Court enter judgment in Mr. Wenninger's favor against LF and order the immediate payment of disability income benefits retroactive to the date that benefits were wrongfully denied, 7/19/25.

B) That this Court to order LF to honor Mr. Wenninger's total disability waiver of life insurance premium/extended death benefit.

C) That this Court order LF to pay Mr. Wenninger *approximately* $10,102.89, which represents the adverse tax consequences Mr. Wenninger sustained as well as interest on the monies that he repaid LF.

D) That this Court order LF to pay Mr. Wenninger pre- and post-judgment interest.

E) That this Court award attorneys' fees pursuant to 29 U.S.C. § 1132(g).

F) That Mr. Wenninger be awarded any and all other types of relief to which he may be entitled, along with the costs of litigation.

Respectfully submitted:

**FELDHEIM & WILENKIN, P.C.**

By: s/Ilana S. Wilenkin
Ilana S. Wilenkin (P61710)
Plaintiff's attorney
30300 Northwestern Highway, Suite 108
Farmington Hills, MI 48334
(248) 932-3505; fax (248) 932-1734
ilana@lawsmf.com

Dated: April 27, 2026